No. 17.—FRANCES LENNARD, plaintiff in error, *vs.* THOMAS BOYNTON, defendant in error.

[1.] One to whom a slave is hired for a year, is entitled to no abatement of the price because of the death of the slave after the commencement of the term.

Assumpsit, &c. in Talbot Superior Court. Decision by Judge IVERSON, September Term, 1851.

Thomas Boynton brought suit against Frances Lennard, on a note for $100, given for the hire of a negro, for the year 1850, and payable to Rebecca Boynton, or bearer.

Frances Lennard pleaded that the negro died on the 1st May, 1850, and that the note was transferred to Lennard on 1st February, 1851, after it was due, and with notice of this defence.

On motion, the Court below struck out this plea, and this decision is assigned as error.

E. H. WORRILL, for plaintiff in error.

B. HILL, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] The only question in this case is, whether, when a negro is hired for a year, and he dies within the time, the hirer should be allowed a credit upon his note, from the time of the negro's death to the end of the year, for so much as the hire for that time would amount to ?

In Scotland, France, Canada, Louisiana, and indeed all those countries where the Civil Law obtains, it is probable that the hire would be apportioned. In South Carolina, where the Common Law has never been adopted throughout, as the basis of their jurisprudence, the same doctrine obtains, and the Courts of that State apply the same principle to real estate. *Ripley vs. Wightman,* 4 *McCord's* R. 447.

In Virginia, it has been held, that if a slave who is hired for a year, be *sick*, or *run away*, the *tenant* must nevertheless pay the hire; but if the slave *die* without any fault in the tenant, the *owner* and not the *tenant*, should lose the hire from the death of the slave, unless otherwise agreed upon. *Gurge vs. Elliot*, 2 *Hen. & Munf. R.* 5.

The reason given by Chancellor *Taylor* is, that pursuing this rule, the act of God falls on the *owner*, on whom it must have fallen if the slave had not been hired. *Non constat !*

And the Court of Appeals of South Carolina, seem to consider this decision and the previous ruling of their own, in *Ripley vs. Wightman*, that if a man lease a house for a year, and during the time it is rendered untenantable by a storm, the rent ought to be apportioned according to the time it was occupied, as decisive of the question, that where a slave hired for the year, dies within the year, his wages should be apportioned. *Bacol vs. Panell*, 2 *Bailey's R.* 424.

The Supreme Court of Missouri had occasion to consider this point, in *Dudgeon vs. Teap*, (9 *Missouri R.* 867,) and while they adhere to the decision of Chancellor *Taylor*, and which seems to be authority for all the subsequent adjudications upon this subject, they state distinctly, that if the analogies of the law on the subject of *rents* be adhered to with strictness, that this doctrine cannot be sustained. And so we think.

If natural justice requires that rent ought to be abated or apportioned, because the thing to be enjoyed be entirely lost or taken away from the tenant, it would be unreasonable to allow the owner hire for a " *dead negro.*"

But we apprehend the principle to be now well settled that where the lessee covenants to pay rent, he is bound to pay it, whatever injury may happen to the demised premises; and that if the tenant would guard himself against loss by fire and tempest, he must introduce into his lease an exception to this effect. *Paradine vs. Jane*, *Aleyn R.* 27. Cited per Lord *Ellenborough*, *C. J.* 10 *East.* 533. *Argument*, *Brecknosk Company vs. Pritchard*, 6 *T. R.* 751. Recognized per Lord *Kenyon C. J. Ib.* 752. *Wood. L. and T.* 5th ed. 471, 418. *Belfleur vs. Weston*, 1 *Term*

*Rep.* 312. *Monk vs. Cooper,* 2 *Lord Raymond,* 1477. *Carter vs. Cunnius,* 1 *Ch. Cases,* 83. 2 *Vernon,* 280. 1 *Fonbl. Eq.* 378, 379, *and the authorities there cited.*

This is no longer an open question with this Court, as to *real estate.* In the well-considered case of *White vs. Molyneux,* (2 *Kelly's R.* 124) we held, upon a full review of all the authorities, that in case of express contracts to pay rent, the destruction of the premises by fire, or violence, or any casualty whatever, is not a good defence to an action to recover the rent, unless there is an express stipulation to that effect; and that a Court of Equity could not relieve against such contracts, under such circumstances.

With that opinion, supported as it is by an overwhelming weight of authority, we have no reason to be dissatisfied. Independent of precedents, and if this were a case of the first impression, why I ask, should not a party who, by his contract, creates a duty or charge upon himself, be bound to make it good, notwithstanding any accident by inevitable necessity ?

But it is said, that it would be unreasonable that these things which are inevitable by the act of God, which no industry can avoid, nor any policy prevent, should be construed to the prejudice of any person in whom there was no laches. 1 *Rep.* 97. And the maxim of the Common Law, *actus Dei nemini facit injuriam,* is invoked in aid of the defence set up to the recovery of this hire.

How far this principle was justifiable inadjudging emblements to those who had an uncertain interest in lands, which was determined between the period of sowing and the severance of the crop, I will not undertake to say. That the rule, like many others respecting real estate, was introduced to favor the landed aristocracy of England, by encouraging husbandry and preventing the ground from remaining uncultivated, is obvious enough.

But where it is assumed as the ground for a legal judgment, that the dispensation of Providence shall prejudice no one who is guilty of no default on his part, I beg leave to demur to the proposition. Not to adduce innumerable other illustrations, I will refer to one only, which is directly in point. Negroes were

hired at the beginning of last year, owing to the high price of cotton and other produce, at the most extravagant rates, throughout the State. Owing to the unparalleled drought in the middle countries, the failure in the crops was almost entire. Is not this *actus Dei*, in withholding the early and the latter rain? No laches is attributable to the hirer. If the death of the negro would entitle him to relief, why should not this other Providential visitation? In our judgment, neither should. He hired the slave for the year, *unconditionally*. He must comply with his engagement.

The one view of this matter is simple and intelligible; it is neither more nor less, than the coercion of the party to fulfil his contract. The other is vague and fluctuating, because it rests on no solid foundation. For I speak with reverence, when I say that the acts of God, by hail, drought, inundation, pestilence, tornado, and the ten thousand judgments, public and private, by which he afflicts for their good, the children of men, prevent the fulfilment of more contracts, than all human misconduct put together.

Suppose it were otherwise, why should the loss fall exclusively upon the owner of the reversion or fee? Is it not enough that he is deprived of his property? And is not the hirer the *quasi* owner for the time being? Does he not take the risks for the year, unless he stipulates against them? Does he pay a premium by way of addition to the price of hire, for life insurance? If not, why give him virtually the benefit of such a policy? Why tax the owner with it, when he is paid nothing for it? He agrees to take the value of the servant's labor merely; and if he is to be considered as having insured his life, he should be compensated for the risk.

The uncertainty of the negro's life was equally well known to both Boynton and Lennard, when the contract for the hire was entered into between them. They were capable of making their own agreement, and in the way most acceptable to themselves. What power has any Court to modify or change their contract? When the slave was delivered, the contract was executed by the owner. His part of it was performed. Lennard

Lennard *vs.* Boynton.

expressly stipulated to pay the hire; and however hard it may be upon him to pay wages for services which cannot be rendered, let it be kept in mind that he brought this hardship upon himself. It was his own voluntary act, and he has no claims upon the justice of the Courts to be relieved.

Apart from the principle involved, motives of public policy forbid a rescission of this contract. Humanity to this dependent and subordinate class of our population requires, that we should remove from the hirer or temporary owner, all temptation to neglect them in sickness, or to expose them to situations of unusual peril and jeopardy. We say to them, go, and they must go; stay, and they must stay; whether it be on the railroads, the mines, the infected districts or any where else. Let us not increase their danger, by making it the interest of the hirer to get rid of his contract, when it proves to be unprofitable. Every safeguard, consistent with the stability of the institution of slavery, should be thrown around the lives of these people. For myself, I verily believe, that the best security for the permanence of slavery, is adequate and ample protection to the slave, at our own hands.

Slavery not being tolerated in England, no case precisely in point could be found in the Reports of that country. In our judgment, however, the case of rent for demised premises and that of the hire of negroes, is not only strikingly, but strictly analogous. One is compensation for the use of houses and lands, the other for slaves. And if the Courts will not relieve the tenant from the payment of rent, when the demised premises is destroyed by casualty, and we have held that they could not, still more emphatically does policy at least, if not principle, forbid relief against the hire of a negro who has died before the expiration of the term. We have great respect for the distinguished Chancellor of Virginia, who decided differently, and for the very able tribunals in our sister States, who have subscribed to the doctrine thus established. Entertaining a contrary view of this question, both upon principle and policy, we cannot interfere to discharge Mr. Lennard from his undertaking, fairly and freely made, however hard it may appear.

The judgment of the Circuit Court must be affirmed.